# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**121eCommerce LLC**, an Ohio limited
liability company,

          Plaintiff,

  v.

**TNG Worldwide, Inc.**, a Michigan
limited liability company,

    and

**Lawrence Gaynor**, in his individual and
corporate capacities,

          Defendants.

Case No.

Judge

Jury Trial Demanded

---

Sarah M. Benoit (P75088)
Ulmer & Berne LLP
65 East State Street, Suite 1100
Columbus, Ohio 43215-4213
Phone: (614) 229-0016
Fax: (614) 229-0017
sbenoit@ulmer.com

*Counsel for Plaintiff 121eCommerce LLC*

## <u>COMPLAINT FOR DAMAGES</u>

Plaintiff 121eCommerce LLC ("121"), by and through counsel, for its Complaint against Defendants TNG Worldwide, Inc. ("TNG") and Lawrence Gaynor states as follows:

## <u>INTRODUCTION</u>

1.     In 2021, TNG hired 121 to redesign its website. The parties entered into two separate agreements, both of which clearly and unambiguously set forth the scope of work that the parties agreed 121 would complete, as well as TNG's responsibilities.

2.     As a result of TNG's and its vendors' failures, the website redesign project was completed later and at a higher cost than TNG preferred.

3.     TNG, through its representatives like its President and CEO Lawrence Gaynor, then disseminated materially false, misleading, and disparaging statements about 121 and the website redesign project to Adobe, Inc. ("Adobe"), which had frequently referred potential customers to 121. Defendants made these statements to Adobe with the intent to damage both 121's reputation and its referral relationship with Adobe.

4.     Defendants were successful in harming 121's reputation and relationship with Adobe. Shortly after Defendants made the false and defamatory

statements, Adobe drastically reduced the number of web-design jobs it referred to 121, effectively blacklisting 121 within Adobe.

5.     As a direct result of Defendants' conduct, 121 has been harmed financially and, therefore, brings this lawsuit to recover those damages.

## PARTIES, JURISDICTION, AND VENUE

6.     121 is an Ohio limited liability company whose principal place of business is located at 2940 Noble Rd, Cleveland, OH 44121.

7.     121 has two members, both of whom are individuals who reside in and are citizens of the State of Ohio.

8.     Therefore, for purposes of subject matter jurisdiction, 121 is deemed a citizen of the State of Ohio.

9.     On information and belief, TNG is a Michigan corporation with its principal place of business located at 29683 William K Smith Dr., New Hudson, Michigan 48165.

10.     Therefore, for purposes of subject matter jurisdiction, TNG is a citizen of the State of Michigan.

11.     Defendant Lawrence Gaynor is, or at all relevant times was, an owner, officer, director, or manager of TNG. On information and belief, he is the statutory agent for TNG. At all times relevant to this Complaint, acting alone or in concert with others, he formulated, directed, controlled, had the authority to control, and/or

participated in the acts and practices set forth in this Complaint. On further information and belief, Defendant Lawrence Gaynor resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District.

12.     Therefore, for purposes of subject matter jurisdiction, Defendant Lawrence Gaynor is a citizen of the State of Michigan.

13.     Because the parties are from different states and the amount in controversy exceeds $75,000, exclusive of costs, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

14.     Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2).

<u>**GENERAL ALLEGATIONS SUPPORTING ALL CLAIMS**</u>

**I.     121 has maintained a longstanding business relationship with Adobe.**

15.     121 provides web services specifically focused on eCommerce websites, including website development, support and maintenance, and other services.

16.     Since 2016, 121 has maintained a business relationship with Adobe within Adobe's Partner Connection Program.

17.     In early 2020, 121 became an Adobe Certified Gold Partner ("Gold Partner"). To become a Gold Partner, 121 had to meet various requirements to

demonstrate that it could competently handle Magento–Adobe's open-source e-commerce platform–and Adobe Commerce implementation.

18.     As a Gold Partner, 121 receives a higher level of access to Adobe's products than other companies. Gold Partners are assigned an Adobe Account Representative and Cloud Services Representative, and are provided with connections throughout the Adobe organization for technical and product support.

19.     In December 2020, 121 received its Adobe Commerce Specialization, which is a designation given to companies that demonstrate a high level of expertise in Adobe Commerce.

20.     Being a Gold Partner distinguishes 121 from competitors, including by showing that it has the core competencies to handle clients' projects.

21.     121 spends approximately of $50,000 annually to pay for the license fees to be a Gold Partner. This includes the cost for 121's developers to attend training courses to earn their certification as an Adobe Certified Expert.

22.     Additionally, 121 pays approximately $60,000 annually for a full-time trainer for its developers to earn their certification as Adobe Certified Experts.

23.     Since 2016, 121 enjoyed an excellent reputation with Adobe, and since 2020 that positive reputation grew as a result of 121 becoming a Gold Partner with Commerce Specialization.

24.     Over the years, Adobe has referred over 150 of its customers to 121 for various website maintenance and redesign jobs.

25.     On information and belief, there are two groups within Adobe for referral jobs.  The first is Adobe's sales team, which is responsible for selling licenses to customers for new Adobe builds.

26.     In that scenario, the potential customer approaches Adobe and, depending on various factors including revenue, business size, and geography, the potential customer is assigned to an Adobe sales representative.

27.     After review, the Adobe sales representative may assign the potential customer to a company within Adobe's Partner Connection Program.

28.     Adobe does not have any obligation to assign the potential customer to any particular member of the Partner Connection Program, which is why the reputation within Adobe of the particular member of the Partner Connection Program, along with the personal relationships with the Adobe sales representatives, is so important.

29.     The second group is Adobe's Customer Success Management (or CSM) Team.  The CSM Team services existing customers that already have Adobe licenses.

30.     From a sales perspective, if the customer's current website is being handled by a company within the Partner Connection Program, but that company

cannot handle the project, the CSM Team may refer the customer to other members of the Partner Connection Program (like 121).

31.     Those projects are referred to as "rescues," and 121 had earned Adobe's trust on handling rescue projects, regardless of how complex the jobs were.

32.     The process followed by the CSM Team is similar to those followed by the sales team in that it is up to the CSM Team to assign the rebuilds to members of the Partner Connection Program that the CSM Team member believes is competent to handle the project.

33.     Regardless of whether the project comes from the sales team or the CSM Team, negative feedback affects the Partner Connection Program member from receiving new leads from Adobe.

34.     The majority of 121's revenue comes from jobs referred by Adobe.

## II.     TNG contracted with 121 to redesign TNG's website.

35.     In or around December 2020, TNG contacted 121 for assistance with the maintenance and redesign of its website. TNG interviewed 121 and ultimately decided to retain 121 to maintenance and redesign TNG's website (the "TNG Project").

36.     As part of the TNG Project, TNG and 121 entered into two separate agreements governing the parties' relationship. First, on January 6, 2021, the parties entered into a Development, Maintenance & Optimization Services Agreement (the

"January Agreement").  A true and accurate copy of the January Agreement is attached as Exhibit 1.

37.     Second, on March 17, 2021, TNG agreed to a proposal provided by 121 for the redesign of TNG's website (the "March Agreement").  A true and accurate copy of the March Agreement is attached as Exhibit 2.

38.     Both the January Agreement and the March Agreement incorporated 121's Terms and Conditions, a true and accurate copy of which is attached as Exhibit 3.

39.     The January Agreement was an hourly services agreement, and the March Agreement set out the scope of work that the parties agreed 121 would complete, as well as TNG's various responsibilities.

40.     121 encouraged TNG to review the agreements, and specifically the scope of work defined by the March Agreement. TNG conducted no more than a minimal review of the scope of work prior to signing the March Agreement.

41.     The March Agreement is a ninety-two page document. On information and belief, Defendant Lawrence Gaynor reviewed the document, but never reviewed beyond page fourteen of the document, and spent only approximately six-and-a-half minutes reviewing the other pages of the March Agreement.

42.     On information and belief, Dawn Kuhn–TNG's Chief Financial Officer—also reviewed aspects of the March Agreement, but that was limited to a

total of approximately six minutes, all on the cover page of the document. On information and belief, Ms. Kuhn did not review any aspect of the March Agreement in any level of detail past the cover page of the document.

43. Throughout the TNG Project, TNG's management appeared to not understand its responsibilities in ensuring a successful redesign and launch.

44. 121 completed the work it agreed to complete, in accordance with the January Agreement and the March Agreement. The TNG Project, however, was hampered by TNG's failures to provide necessary information, conduct necessary review and testing of the website components, and communicate with existing vendors to complete required work to integrate TNG's existing enterprise resource planning ("ERP") solution provided by SAP ERP (a specific provider of ERP software).

45. For example, the integration work was to be completed by TNG's existing vendor InSync Tech-Fin Solutions, Ltd. ("InSync"). InSync, however, failed to deliver its integration work on a timely and functional basis, causing significant delays and increased costs on the TNG Project. TNG was aware of InSync's failures at all times but was unable to resolve those issues with its vendor.

46. In or around January 2022, TNG and 121 ended their business relationship.

**III.  Shortly after TNG and 121 end their business relationship, 121 began receiving fewer job referrals from Adobe.**

47.     From 2019 to 2021, the number of web design job referrals 121 received from Adobe more than doubled each year.

48.     In 2021, Adobe referred 57 jobs to 121, which generated more than $2,000,000 in revenue for 121.

49.     In early 2022, however, 121 experienced a precipitous decline in the number of job referrals it received from Adobe.

50.     The decline in job referrals was evident within the first half of 2022. In the first six months of 2021, Adobe referred 18 jobs to 121, which generated over $550,000 in revenue for 121. By contrast, in the first six months of 2022, Adobe only referred 8 jobs to 121, which generated less than $30,000 in revenue.

**IV.    TNG and Lawrence Gaynor misrepresented to Adobe the circumstances surrounding the TNG Project.**

51.     In or around February 2022, the Director of Sales at 121, Paul Firestine, received a call from an Adobe Sales Representative named Mark Williamson. Mr. Williamson informed Mr. Firestine that one of Adobe's customers had complained to an Adobe customer service manager about 121's performance on a job.

52.     According to Mr. Williamson, the customer service manager informed the sales team at Adobe about the customer's complaint.

53.     121 contacted Adobe to determine the source and nature of the customer's accusations and learned from Adobe that it was TNG that had complained about 121 and the TNG Project.

54.    121 also learned that TNG and Mr. Gaynor made numerous materially false and misleading statements to Adobe regarding the circumstances of the TNG Project.

55.    For example, TNG, through Mr. Gaynor, told Adobe that :

    a.    121 misrepresented the services that it could offer;

    b.    121 was nonresponsive during the job;

    c.    121 failed to properly implement TNG's redesign project; and

    d.    121 overall failed to manage the TNG project.

56.    Those statements are false, as 121 performed all of its obligations under the January Agreement and March Agreement, and any harm that TNG allegedly suffered in connection with the TNG Project was caused by parties over which 121 had no control or responsibility, including TNG itself.

57.    Nonetheless, as a result of those statements, Adobe customer service personnel discouraged other personnel from referring work to 121.

58.    On information and belief, at least some of the false and defamatory communications from TNG to Adobe were sent via email and bypassed Adobe's standard protocols and/or procedures for partner escalation, and it is 121's understanding that Defendant Lawrence Gaynor was the source of at least some of those communications.  On information and belief, had the communications been

made pursuant to Adobe's standard protocols and/or procedures, they would not have been disseminated within Adobe.

59.    On May 18, 2022, TNG filed a Demand for Arbitration with the American Association of Arbitrators against 121 (the "Arbitration Demand"). The allegations in the Arbitration Demand mirror the false and misleading statements previously made by TNG about 121 in its complaint to Adobe. The arbitration is still pending.

60.    As a direct and proximate result of TNG's tortious conduct, 121's business relationship with Adobe has been irreparably fractured, and 121 has suffered both economic and noneconomic damages.

## COUNT ONE
**(Tortious Interference with Business Relationship or Expectancy–against Defendant TNG)**

61.    121 incorporates paragraphs 1-60 above by reference and re-alleges them as originally and fully set forth here.

62.    121 had an excellent business relationship with Adobe in the website design and maintenance industry since 2019.

63.    Based on the nature of its relationship with Adobe, 121 had a reasonable expectation that this business relationship would continue.

64.    In the Arbitration Demand, TNG contends that Adobe had referred it to 121.  Additionally, 121 prominently displays its relationship with Adobe on its website.

65.    Accordingly, TNG knew of this business relationship and expectancy at all relevant times.

66.    TNG has engaged in intentional and improper conduct for the primary, if not sole, purpose of intentionally interfering with 121's business relationship and expectancy with Adobe in the website design and maintenance industry.

67.    TNG's tortious actions include spreading slanderous and defamatory information about the TNG Project and 121's business to Adobe.

68.    By virtue of its conduct, TNG has intentionally and improperly interfered with 121's business relationship and expectancy with Adobe.

69.    TNG's conduct has induced or caused a termination or disruption of 121's business relationship and expectancy with Adobe.

70.    As a direct and proximate result of TNG's intentional and improper interference, 121 has suffered damages in excess of Seventy-Five Thousand ($75,000) Dollars.

71.    Moreover, TNG's actions have caused, and will continue to cause, 121 to suffer noneconomic damages, including loss of goodwill, harm to its business, and loss of business opportunities.

## <u>COUNT TWO</u>
### (Tortious Interference with Business Relationship or Expectancy–against Defendant Lawrence Gaynor)

72.     121 incorporates paragraphs 1-71 above by reference and re-alleges them as originally and fully set forth here.

73.     121 had an excellent business relationship with Adobe in the website design and maintenance industry since 2019.

74.     Based on the nature of its relationship with Adobe, 121 had a reasonable expectation that this business relationship would continue.

75.     In the Arbitration Demand, TNG contends that Adobe had referred it to 121. Additionally, 121 prominently displays its relationship with Adobe on its website.

76.     Given his role within TNG, Defendant Lawrence Gaynor knew of this business relationship and expectancy at all relevant times.

77.     Defendant Lawrence Gaynor has engaged in intentional and improper conduct for the primary, if not sole, purpose of intentionally interfering with 121's business relationship and expectancy with Adobe in the website design and maintenance industry.

78.     Defendant Lawrence Gaynor's tortious actions include spreading slanderous and defamatory information about the TNG Project and 121's business to Adobe.

79.     By virtue of his conduct, Defendant Lawrence Gaynor has intentionally and improperly interfered with 121's business relationship and expectancy with Adobe.

80.     Defendant Lawrence Gaynor's conduct has induced or caused a termination or disruption of 121's business relationship and expectancy with Adobe.

81.     As a direct and proximate result of Defendant Lawrence Gaynor's intentional and improper interference, 121 has suffered damages in excess of Seventy-Five Thousand ($75,000) Dollars.

82.     Moreover, Defendant Lawrence Gaynor's actions have caused, and will continue to cause, 121 to suffer noneconomic damages, including loss of goodwill, harm to its business, and loss of business opportunities.

## COUNT THREE
### (Defamation–against Defendant TNG)

83.     121 incorporates paragraphs 1-82 above by reference and re-alleges them as originally and fully set forth here.

84.     On information and belief, TNG, through its agent/employees, including Lawrence Gaynor, made several misrepresentations and false statements to Adobe about 121's performance on the TNG Project.

85.     The agents/employees' statements, including those of Lawrence Gaynor, were made on behalf, and with the consent, of TNG and, therefore, are attributable to TNG.

86.    The statements were not privileged.

87.    TNG and those acting on its behalf knew or should have known that the statements were false.

88.    At all relevant times, TNG and those acting on its behalf were fully aware that making the false and defamatory statements to Adobe would severely hamper 121's business relationship with Adobe.

89.    Having heard the false and defamatory statements from TNG and those acting on its behalf, Adobe acted upon them, changed its position and relationship with respect to 121, and significantly reduced the number of job referrals directed to 121.

90.    The malicious, willful, and wanton conduct by TNG and those acting on its behalf, as set forth herein, has effectively resulted in 121 being blacklisted by Adobe.

91.    The malicious and unjustified interferences by TNG and those acting on its behalf with 121's business, in addition to the diminishment TNG and those acting on its behalf have caused to 121's good reputation and longstanding goodwill, entitles 121 to exemplary damages.

92.    The false statements and reckless and intentional conduct by TNG and those acting on its behalf have proximately caused 121 to incur damages in excess of Seventy-Five Thousand ($75,000) Dollars.

## COUNT FOUR
### (Defamation–against Defendant Lawrence Gaynor)

93.     121 incorporates paragraphs 1-92 above by reference and re-alleges them as originally and fully set forth here.

94.     On information and belief, Defendant Lawrence Gaynor made several misrepresentations and false statements to Adobe about 121's performance on the TNG Project.

95.     The statements were not privileged.

96.     Defendant Lawrence Gaynor knew or should have known that the statements were false.

97.     At all relevant times, Defendant Lawrence Gaynor was fully aware that making the false and defamatory statements to Adobe would severely hamper 121's business relationship with Adobe.

98.     Having heard the false and defamatory statements from Defendant Lawrence Gaynor, Adobe acted upon them, changed its position and relationship with respect to 121, and significantly reduced the number of job referrals directed to 121.

99.     The malicious, willful, and wanton conduct by Defendant Lawrence Gaynor, as set forth herein, has effectively resulted in 121 being blacklisted by Adobe.

17

100.   The malicious and unjustified interferences by Defendant Lawrence Gaynor with 121's business, in addition to the diminishment he has caused to 121's good reputation and longstanding goodwill, entitles 121 to exemplary damages.

101.   The false statements and reckless and intentional conduct by Defendant Lawrence Gaynor has proximately caused 121 to incur damages in excess of Seventy-Five Thousand ($75,000) Dollars.

### COUNT FIVE
### (Injurious Falsehoods–against Defendant TNG)

102.   121 incorporates paragraphs 1-101 above by reference and re-alleges them as originally and fully set forth here.

103.   TNG, through its agents/employees, including on information and belief Lawrence Gaynor, made several misrepresentations about 121 to Adobe with respect to the TNG Project.

104.   The agents/employees' statements were made on behalf, and with the consent, of TNG and, therefore, are attributable to TNG.

105.   The statements were not privileged.

106.   TNG and its agents/employees knew or should have known that the statements were untrue.

107.   At all relevant times, TNG and its agents/employees were fully aware that making the false and defamatory statements and misrepresentations to Adobe would severely hamper 121's business relationship with Adobe.

18

108.   Having heard the false and defamatory statements and the misrepresentations from TNG and its employees/agents, Adobe acted upon them, changed its position and relationship with respect to 121, and significantly reduced the number of job referrals directed to 121.

109.   As a result of the malicious, willful, and wanton conduct, as set forth herein, by TNG and its employees/agents 121 has effectively been blacklisted by Adobe.

110.   The malicious and unjustified interferences with 121's business, in addition to the diminishment to 121's good reputation and longstanding goodwill, as a direct result of the conduct by TNG and its employees/agents entitles 121 to exemplary damages.

111.   The false statements and reckless and intentional conduct by TNG and its employees/agents has caused 121 to incur damages in excess of Seventy-Five Thousand ($75,000) Dollars.

## COUNT SIX
### (Injurious Falsehoods–against Defendant Lawrence Gaynor)

112.   121 incorporates paragraphs 1-111 above by reference and re-alleges them as originally and fully set forth here.

113.   On information and belief, Defendant Lawrence Gaynor made several misrepresentations and false statements to Adobe about 121's performance on the TNG Project.

114.    The statements were not privileged.

115.    Defendant Lawrence Gaynor knew or should have known that the statements were false.

116.    At all relevant times, Defendant Lawrence Gaynor was fully aware that making the false and defamatory statements to Adobe would severely hamper 121's business relationship with Adobe.

117.    Having heard the false and defamatory statements from Defendant Lawrence Gaynor, Adobe acted upon them, changed its position and relationship with respect to 121, and significantly reduced the number of job referrals directed to 121.

118.    The malicious, willful, and wanton conduct by Defendant Lawrence Gaynor, as set forth herein, has effectively resulting in 121 being blacklisted by Adobe.

119.    The malicious and unjustified interferences by Defendant Lawrence Gaynor with 121's business, in addition to the diminishment he has caused to 121's good reputation and longstanding goodwill, entitles 121 to exemplary damages.

120.    The false statements and reckless and intentional conduct by Defendant Lawrence Gaynor has proximately caused 121 to incur damages in excess of Seventy-Five Thousand ($75,000) Dollars.

WHEREFORE, Plaintiff 121eCommerce LLC requests that this Court enter judgment in its favor, and requests relief as follows:

A.    Judgment entered in its favor and against Defendants TNG and Lawrence Gaynor on each count of the Complaint;

B.    An award of damages to 121 in excess of Seventy-Five Thousand ($75,000) in an amount to be proven;

C.    An award of exemplary damages to 121;

D.    An order enjoining Defendants TNG and Lawrence Gaynor from making any further false and defamatory statements regarding 121's business and the TNG Project;

E.    An award to 121 of prejudgment interest;

F.    An award to 121 for its costs, attorneys' fees and expenses arising from this suit; and

G.    An order granting 121 such other relief as this Court deems just and proper.

Date:  August 12, 2022                    Respectfully submitted,

                                          Ulmer & Berne LLP


                                          /s/ *Sarah M. Benoit*_____
                                          Sarah M. Benoit

                                          **Counsel for Plaintiff**

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all counts of their Complaint so triable.

Date:  August 12, 2022                                    Respectfully submitted,

                                                                          Ulmer & Berne LLP


                                                                          /s/ *Sarah M. Benoit*_____
                                                                          Sarah M. Benoit

                                                                          ***Counsel for Plaintiff***